STATE OF CONNECTICUT *v.* MAURA ROGERS
(6910)

STATE OF CONNECTICUT *v.* PAUL ROGERS
(6911)

BORDEN, DALY and NORCOTT, Js.

Argued December 21, 1988—decision released April 11, 1989

*Timothy J. Sugrue,* deputy assistant state's attorney, with whom, on the brief, was *Francis J. McQuade,* assistant state's attorney, for the appellant (state).

*Richard T. Meehan, Sr.,* with whom were *Richard T. Meehan, Jr.,* and *Judith Stevens,* for the appellees (defendants).

BORDEN, J. In these consolidated cases, the state appeals, with the permission of the trial court, from the judgments dismissing the informations following the granting of the defendants' motions to suppress. The state claims that, because some of the seized items were admissible under the "independent source" exception to the exclusionary rule, the trial court committed

plain error by suppressing all the results of the search of the defendants' house. We conclude that the case should be remanded to the trial court to determine the application of the independent source doctrine.

The defendant Maura Rogers was charged with illegal possession of narcotics in violation of General Statutes § 21a-279 (a). The defendant Paul Rogers was charged with illegal sale of drugs in violation of General Statutes § 21a-278 (a), and with interfering with an officer in violation of General Statutes § 53a-167a. These charges arose out of a search by the police of the defendants' house in Milford on December 19, 1986. The search followed a warrantless entry of the house by the police, who then secured the premises, and sought and obtained a search warrant for the house from a Superior Court judge, *McKeever, J.* Some evidence was seized during the two or three hour interval between the initial entry by the police and the issuance of the search warrant, and some evidence was seized after the warrant was issued.

The defendants moved to suppress all the evidence yielded by the search of the house. The trial court, *Curran, J.,* found the following facts: On December 19, 1986,[1] an undercover police officer had arranged to purchase one quarter of a pound of cocaine from Victor Braese, from whom he had made previous purchases. Because the source of the cocaine in the previous purchases had been John DeCeasre of Milford, arrest and search warrants were obtained on December 19, 1986, for the persons and homes of Braese and DeCeasre. The undercover officer was carrying a transmitter that was to be monitered by other police officers who would be in separate vehicles. When the undercover officer

---

[1] The trial court's reference in its memorandum of decision to November 19, 1986, is obviously a clerical error.

met with Braese, Braese told him that they would be going to a new source for this purchase, at another location in Milford.

Braese and the undercover police officer, followed by the other police officers, went to the defendants' house in Milford, where the undercover officer gave Braese $250 for the purchase of an "eight ball," a sample of the cocaine that was to be purchased. Braese entered the defendants' house.

The court further found that while Braese was inside the house, the officers in charge agreed that if Braese returned with what was alleged to be cocaine, he would be arrested immediately, and that they would enter the house, secure the premises and then obtain a search warrant. When Braese returned to the undercover police officer's car outside the house, he displayed what purported to be an ounce of cocaine but indicated that in order for the undercover officer to receive the "eight ball," they would have to go to Braese's home in Shelton and cut it up. He also indicated that if the undercover officer wanted the quarter pound he had better make up his mind quickly or it would be gone.

The court also found that, at this point, as previously agreed, the officers entered the defendants' house without a warrant and secured the premises while a search warrant was being obtained. When they entered the premises, the officers did not knock but kicked in the door, and after they were inside announced that they were police officers. There were three people in the house: the two defendants and a child who was the son of Paul Rogers. Maura Rogers and the child were in the living room watching television. Paul Rogers was in a hallway off the kitchen, standing at the top of the stairs leading to the basement. He was told to stay where he was, but he bolted down the stairs. The police let loose a police dog, and Paul Rogers was appre-

hended in the basement. After placing him under arrest, the police remained in the house while two officers were directed to obtain a search warrant for the premises. The search of the house yielded cocaine, a large amount of cash and other items.

As disclosed by their trial briefs on the motions to suppress, the defendants claimed that the search of the house was performed without a warrant, that it followed a forcible entry of the home without the police first having knocked and announced their purpose, and that it was not justified by any exigent circumstances. The defendants also claimed that there was no probable cause for the issuance of the search warrant, and that, even if there were, the warrant was obtained as a result of the illegal conduct of the police in forcibly entering the defendants' house without knocking and announcing their purpose. The state sought to uphold the warrantless entry and ensuing search of the premises on the ground that there was both probable cause and exigent circumstances and that, in the alternative, the officers acted in a good faith belief that they had the right to enter and secure the house without a warrant. The state did not, however, rely on the search warrant or on a claim that the police acted in good faith reliance on the warrant.

The court framed the issue for its determination as "whether following the arrest of Victor Braese, exigent circumstances of a sufficient magnitude existed outside the defendant's house to warrant the entry into the residence thereat without the benefit of a search and seizure warrant." The court concluded that no such exigent circumstances existed, and granted the motions to suppress. The court did not discuss the legal implications, if any, of the search warrant that had been issued; nor did it distinguish in its findings or conclusions between the evidence seized before and after the search warrant was obtained.

The state then moved to reargue the motion to suppress, advancing for the first time the claim that, because the evidence was seized pursuant to the search warrant, the exclusionary rule did not apply, under the inevitable discovery doctrine recognized by the United States Supreme Court in *Nix* v. *Williams,* 467 U.S. 431, 104 S. Ct. 2501, 81 L. Ed. 2d 377 (1984), and our Supreme Court in *State* v. *Badgett,* 200 Conn. 412, 512 A.2d 160 (1986), cert. denied, 479 U.S. 940, 107 S. Ct. 423, 93 L. Ed. 2d 373 (1986). After additional argument and briefing on the state's motion to reargue, the court denied the motion. It found that "while the intention of the police officer in charge may have been to have a subordinate obtain a search warrant, one was not actively pursued *until after the unconstitutional entry of the premises.*" (Emphasis in original.) The court concluded, therefore, that the inevitable discovery doctrine did not apply because that doctrine requires "that the lawful means which made discovery inevitable were possessed by the police and were being actively pursued *prior* to the occurrence of the constitutional violation." (Emphasis in original.) *State* v. *Badgett,* supra, 433.

The court thereafter dismissed the informations. These appeals followed.

On appeal, the state raises, for the first time, a different exception to the exclusionary rule, namely, the independent source doctrine.[2] It claims that the trial court committed plain error by suppressing *all* of the evidence seized from the defendants' house, because some

---

[2] The state has confined its argument on appeal to the independent source doctrine as an exception to the exclusionary rule under the federal constitution. The defendants, despite a reference to the Connecticut constitution in their brief, have not offered an independent analysis of that doctrine under the Connecticut constitution. Under these circumstances, we decline to undertake such an analysis, and we confine our discussion to the applicability of the doctrine under the federal constitution.

of the items were legally seized pursuant to the search warrant and therefore were admissible under that doctrine.

It is useful to note what the state does not challenge. It does not challenge the conclusion that the inevitable discovery doctrine does not apply. It does not challenge the trial court's finding that exigent circumstances did not exist for the warrantless entry of the house, and it does not challenge the conclusions that the initial entry was illegal and that the illegal entry and ensuing security check of the house constituted an illegal search. Nor does it challenge the suppression, as the fruit of the illegal search, of what the state characterizes as "the prewarrant evidence." This evidence, the state claims, consists of a screening device containing a small amount of cocaine and a document on which drug transactions were recorded that were found in the basement when Paul Rogers was apprehended there, and a rifle found in an upstairs bedroom during the initial security check of the house.

The state does challenge the suppression of what it characterizes as "the postwarrant evidence." This evidence, which the state claims was found in the search pursuant to the warrant, consists of one quarter of a pound of cocaine found in a microwave oven, approximately $5800 in cash found in a bedroom, a scale found in the basement, and some marihuana and records of drug transactions found in a desk.

We first consider whether, as the state argues, its claim is reviewable under the plain error doctrine. Practice Book § 4185. We conclude that it is. "Although generally plain error review is limited to instances involving confidence in the fairness and integrity of the adjudicative process; *Smith* v. *Czercel,* 12 Conn. App. 558, 563, 533 A.2d 223 (1987); the doctrine essentially invokes the discretion of the court. *Finley* v. *Aetna Life*

*& Casualty Co.,* [202 Conn. 190,] 196, [520 A.2d 208 (1987)]. One standard for this appellate discretion is whether the issue is of importance to the development of the law of the state, is vital to the proper resolution of the case, and was sufficiently presented to the trial court initially . . . so that appellate consideration of it does not amount to ambuscade of the trial court. *Finley* v. *Aetna Life & Casualty,* 5 Conn. App. 394, 402–403, 499 A.2d 64 (1985), rev'd on other grounds, 202 Conn. 190, 520 A.2d 208 (1987). It is this latter branch of the plain error doctrine which we invoke here." *Daley* v. *Gaitor,* 16 Conn. App. 379, 383, 547 A.2d 1375 (1988).

The independent source doctrine as an exception to the exclusionary rule was first articulated by the United States Supreme Court in *Silverthorne Lumber Co.* v. *United States,* 251 U.S. 385, 40 S. Ct. 182, 64 L. Ed. 319 (1920). Simply put, it states that the rule barring the use of illegally obtained evidence "does not mean that the facts thus obtained become sacred and inaccessible. If knowledge of them is gained from an independent source, they may be proved like any others . . . . " Id., 392. The rationale for the doctrine is "that the interest of society in deterring unlawful police conduct and the public interest in having juries receive all probative evidence of a crime are properly balanced by putting the police in the same, not a *worse,* position [than] that they would have been in if no police error or misconduct had occurred. . . . When the challenged evidence has an independent source, exclusion of such evidence would put the police in a worse position than they would have been in absent any error or violation." (Citation omitted; emphasis in original.) *Nix* v. *Williams,* supra, 443.

Our Supreme Court has recognized, in other factual contexts, the independent source doctrine as an exception to the exclusionary rule. "The exclusionary rule

applies to suppress evidence obtained in violation of the fourth amendment to the United States constitution. Its sweep is not so broad, however, that it mandates suppression of evidence obtained independently of the illegality. *Segura* v. *United States,* 468 U.S. 796, 813–16, 104 S. Ct. 3380, 82 L. Ed. 2d 599 (1984)." *State* v. *Ostroski,* 201 Conn. 534, 542, 518 A.2d 915 (1986); *State* v. *Arpin,* 188 Conn. 183, 190, 448 A.2d 1334 (1982) (independent source rule has vitality in context of search warrant).

The state in this case relies principally on the application of the independent source doctrine by the United States Supreme Court in *Segura* v. *United States,* supra, and in numerous other cases that both follow and predate *Segura.* See, e.g., *United States* v. *Crespo de Llano,* 830 F.2d 1532 (9th Cir. 1987); *United States* v. *Curry,* 751 F.2d 442 (1st Cir. 1984); *United States* v. *Agapito,* 620 F.2d 324 (2d Cir.), cert. denied, 449 U.S. 834, 101 S. Ct. 107, 66 L. Ed. 2d 40 (1980). In *Segura,* the court considered "whether, because of an earlier illegal entry, the Fourth Amendment requires suppression of evidence seized later from a private residence pursuant to a valid search warrant which was issued on information obtained by the police before the entry into the residence." Id., 797–98. The court applied the independent source doctrine to deny the suppression of evidence gathered pursuant to the search warrant that was obtained while the illegally entered premises were secured from the inside. Id., 813–16.[3] Neither our

---

[3] In *Segura* v. *United States,* 468 U.S. 796, 104 S. Ct. 3380, 82 L. Ed. 2d 599 (1984), the admissibility of the evidence discovered and seized pursuant to the search warrant did not turn on the issue of whether the nineteen hour police occupation of the defendants' dwelling to prevent the destruction of evidence while a search warrant was being sought was itself an unreasonable seizure. Chief Justice Burger's assertion, in part IV of his opinion, that such an occupation was not an unreasonable seizure received the vote of only Justice O'Connor. The court held the evidence to be admissible, rather, because the search warrant was procured on the basis of evi-

Supreme Court nor this court, however, has had occasion to determine whether and to what extent the independent source exception to the exclusionary rule applies in the factual scenario presented by this case.[4] Thus, this "issue is of importance to the development of the law of the state . . . ." *Daley* v. *Gaitor,* supra.

Furthermore, whether the exclusionary rule should be applied to the evidence gathered by the search of the defendants' premises, or whether the independent source exception to that rule applies, is largely determinative of the outcome of the charges against the defendants. If the exclusionary rule applies, the defendants are entitled to the dismissals. On the other hand, "[t]here can be no question of the great harm to the state in the dismissal of charges alleged involving serious drug dealing." *State* v. *Scott,* 10 Conn. App. 347, 353, 522 A.2d 1245, cert. denied, 204 Conn. 804, 528 A.2d 1152 (1987). Thus, this issue is "vital to the proper resolution of the case . . . ." *Daley* v. *Gaitor,* supra.

dence obtained prior to the illegal entry, and any evidence gathered pursuant to the valid search warrant therefore could not be said to have been the fruit of the illegal entry. Id., 813–16.

The dissent criticized the court's holding for providing "government agents with an affirmative incentive to engage in unconstitutional violations of the privacy of the home"; id., 817; by permitting the police "to benefit from [blatantly unconstitutional] conduct by avoiding the risk that evidence would be unavailable when the search warrant was finally executed." Id., 838. Thus, the dissenters argued, the court's opinion, by inviting violations of the fourth amendment, works in diametric opposition to the "principal purpose of the exclusionary rule [which is] to deter violations of the Fourth Amendment." Id., 828.

[4] In this connection, however, we note that our Supreme Court has cited *Segura* v. *United States,* 468 U.S. 796, 104 S. Ct. 3380, 82 L. Ed. 2d 599 (1984), in its recognition of the independent source doctrine; see *State* v. *Ostroski,* 201 Conn. 534, 542, 518 A.2d 915 (1986); and in the same paragraph cited, with apparent approval, the decision in *State* v. *Kelly,* 718 P.2d 385, 392 (Utah 1986), for the proposition that "suppression [was] properly denied where [the] source of [the] search warrant was independently legal and unrelated to [the] illegal impounding of premises." *State* v. *Ostroski,* supra, 543.

Finally, the state urged in the trial court the inevitable discovery doctrine as articulated by the United States Supreme Court in *Nix* v. *Williams,* supra, where the court also explicitly recognized that doctrine as "closely related to" the independent source doctrine; id.; and also recognized that there "is a functional similarity between [the] two doctrines . . . ." Id., 444; see also *Murray* v. *United States,* 487 U.S. 533, 539, 108 S. Ct. 2529, 101 L. Ed. 2d 472 (1988) (inevitable discovery doctrine is extrapolation from independent source doctrine). For their part, the defendants, in their trial court memorandum of law in support of their motions to suppress, referred to *Segura* v. *United States,* supra. Thus, the issue "was sufficiently presented to the trial court initially . . . so that appellate consideration of it does not amount to ambuscade of the trial court." *Daley* v. *Gaitor,* supra, 383.

We decline the state's invitation, however, to determine ourselves from this record whether the so-called "postwarrant evidence" was admissible under the independent source doctrine. Whether evidence is the product of illegality or of a source sufficiently independent thereof is, in the first instance, a factual question. *Murray* v. *United States,* supra. The trial court, which has the responsibility for finding facts, has not yet had occasion to consider that factual question, because it was not the focus of either the motions to suppress or the motion to reargue. Nor do we have the benefit of specific factual findings by the trial court regarding what was seized pursuant to the initial, illegal entry and what was seized pursuant to the warrant. Because the state claims only that the evidence seized after the warrant was issued is subject to the independent source doctrine; but see *Murray* v. *United States,* supra, 540–41 (apparently eliminating distinction between evidence seized before and after intervention of search warrant as independent source); these factual findings are neces-

sary in this case. Furthermore, the independent source claimed here is the search warrant, the validity of which has not yet been litigated because of the procedural posture of the case in the trial court. The defendants are entitled to challenge that warrant if they deem it appropriate.

Under similar circumstances, our Supreme Court remanded a criminal appeal to determine whether illegally obtained evidence was nonetheless admissible under the inevitable discovery doctrine, an issue which had not been presented to the trial court initially. See *State* v. *Badgett,* supra, 432–34. There the court stated: "Since we have concluded, however, that there must be further proceedings in the trial court to determine the applicability of the inevitable discovery rule under the circumstances of this case, the defendant will have a full opportunity to present in the trial court or in any subsequent appeal any claim, legal or factual, that the rule should not be followed in this case." Id., 432 n.10. We adopt the same principle in this case.[5] Under the circumstances, therefore, we will follow the lead of our Supreme Court in *Badgett,* and remand this case to the

---

[5] We are aware that the 5-4 *Segura* decision has not been free from criticism, much of it echoing Justice Stevens' dissent. See, e.g., 4 W. LaFave, Search and Seizure (2d Ed.) § 11.4 (f); J. Dressler, "A Lesson in Incaution, Overwork, and Fatigue: The Judicial Miscraftsmanship of *Segura* v. *United States,*" 26 Wm. & Mary L. Rev. 375 (1985); A. Peck, "Recent Development: The Securing of the Premises Exception: A Search for the Proper Balance," 38 Vand. L. Rev. 1589 (1985); note, "The Independent Source Exception to the Exclusionary Rule Project: The Burger Court's Attempted Common-Sense Approach and Resulting 'Cure-All' to Fourth Amendment Violations," 28 How. L. J. 1005. *Segura's* most recent progeny, *Murray* v. *United States,* 487 U.S. 533, 108 S. Ct. 2529, 101 L. Ed. 2d 472 (1988); a 4-3 decision, also has been criticized by Professor LaFave. 4 W. LaFave, Search and Seizure (1989 Sup.)§ 11.4 (f), pp. 27–32. The defendants remain free to challenge the admissibility of the evidence seized pursuant to the search warrant by offering an independent analysis of the issue under article first, § 7, of the Connecticut constitution. Compare footnote 2, supra; *State* v. *Nelson,* 17 Conn. App. 556, 568–69 n.9, 555 A.2d 426 (1989).

trial court to determine whether the independent source doctrine is applicable under the circumstances of this case.

In this connection, we note that the United States Supreme Court recently has addressed the focus of the inquiry in order to determine whether a search warrant obtained after an illegal entry is an independent source. "The ultimate question . . . is whether the search pursuant to warrant was in fact a genuinely independent source of the information and tangible evidence at issue here. This would not have been the case if the agents' decision to seek the warrant was prompted by what they had seen during the initial entry, or if information obtained during that entry was presented to the Magistrate and affected his decision to issue the warrant." *Murray* v. *United States,* supra, 2535–36. Furthermore, "[t]o determine whether the warrant was independent of the illegal entry, we must ask whether it would have been sought even if what actually happened had not occurred—not whether it would have been sought if something else had happened. That is to say, what counts is whether the actual illegal search had any effect in producing the warrant, not whether some hypothetical illegal search would have aborted the warrant. Only that much is needed to assure that what comes before the court is not the product of illegality; to go further than that would be to expand our existing exclusionary rule." Id., 2536 n.3.

The case is remanded for further proceedings in accordance with this opinion.

In this opinion the other judges concurred.